## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 17-222 |
| | ) | Judge Nora Barry Fischer |
| DAVID ANTHONY SOMERVILLE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

In this case, Defendant David Anthony Somerville moves to withdraw his guilty pleas to conspiracy and possession with intent to distribute heroin and fentanyl which he entered after the Government had rested its case against him at a jury trial held from April 5, 2022 through April 8, 2022. (Docket No. 406). Defendant maintains that his guilty pleas were not knowing, intelligent and voluntary and/or that he was provided ineffective assistance of counsel during plea proceedings because the Government is now seeking numerous sentencing enhancements and an advisory guidelines range of 292-365 months while he allegedly believed that he would be subject to a much lesser range and sentenced to "time served" incarceration. (Docket Nos. 406; 414). The Government opposes Defendant's Motion, argues that he has failed to sustain his burden to set aside his knowing and voluntary guilty pleas, and asks that the case be set for a sentencing hearing. (Docket Nos. 410; 416). The Motion has been fully briefed and is now ripe for disposition. (Docket Nos. 406; 410; 414; 416). After careful consideration of the parties' positions and for the following reasons, Defendant's Motion [406] is DENIED.

1

II.     BACKGROUND

Given the lengthy history of this matter and because the Court writes primarily for the parties and has set forth the facts in its prior decisions, it focuses on those facts necessary to resolve the pending dispute.  (*See e.g.*, Docket No. 139; 164; 210; 293; 339).

Relevant here, this Court issued a Memorandum Opinion on June 1, 2021 granting the Defendant's motion for bond, holding, among other things, that: he had served 52 and ½ months in pretrial detention as of that date; the COVID-19 pandemic had delayed the trial for a full year; and, his temporary release from custody was warranted so that he could assist his former counsel prepare for trial and obtain necessary mental and emotional health treatment.  (Docket No. 239).  The Court added that while his codefendant Natel Walker had pled guilty and been sentenced to "time served" incarceration after being held in pretrial custody for approximately 40 months, Defendant "insisted on exercising his right to a jury trial."   (*Id*. at 2).  As part of its discussion, the Court noted that:

> the Government's case on the merits appears to be strong based on the evidence presented during pretrial proceedings including narcotics seized from the vehicle Somerville was riding in with his codefendant, Walker, the text messages recovered from the seized cellular phones, and other information from law enforcement witnesses. (*See* Docket Nos. 139 (denying motion to suppress); 164 (denying motion to reopen); 210 (denying motion in limine)). However, the Government's sentencing arguments have shifted considerably during these proceedings starting with its initial proffer of 27-33 months' incarceration and moving on to its current proffers that the range may be 51-63 months or it could "balloon" to 130-162 months' incarceration based on the prosecutor's interpretation that the text message evidence shows a significantly increased drug quantity and that Somerville played a leadership role in a broader conspiracy, prospects that presently appear to be speculative, at best. *See United States v. Kubini*, 2017 WL 2573872, at \*19 (W.D. Pa. Jun. 14, 2017) (citing *United States v. Berry*, 553 F.3d 273, 281 (3d Cir. 2009)) (defendant's sentence may not be enhanced based on "unsupported speculation"); U.S.S.G. § 3B1.1(a)-(c), n.1 (3-level and 4-level enhancements require proof that defendant was organizer/leader or manager/supervisor of criminal activity that

involved five or more participants, which is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted"). Regardless of the ultimate computation of the advisory guidelines range, the Court has broad discretion to consider each of the § 3553(a) factors in determining an appropriate sentence at or below the range including, among other things: the advisory guidelines range of 27-33 months computed for the codefendant, Walker; Somerville's mental and emotional health conditions; the harshness of his pretrial detention during the COVID-19 pandemic (from March 13, 2020 to the present) including being subject to testing, quarantines, lockdowns and limited access to programming and counseling/treatment; and, the impact that his contraction of COVID-19 twice while in custody has had on both his physical and mental health. As such, it appears that Somerville will have at least a plausible argument that a sentence of time served is "sufficient, but not greater than necessary" to meet all of the goals of sentencing in his case. 18 U.S.C. § 3553(a).

(Docket No. 293 at 12-14).

The Court then issued an order releasing Defendant on bond with strict conditions including electronic monitoring and made his mother, Charlotte Windsor, a third-party custodian. (Docket No. 294). He was successful in some respects on bond as he was able to reengage in mental health treatment and counseling, find employment, and meet with his counsel for trial preparation. (Docket Nos. 299; 303; 304; 305). Defendant's bond was continued despite a few issues including positive tests for marijuana on August 11, 2021, and September 15, 2021, and cocaine and marijuana on January 5, 2022. (Docket Nos. 307; 311; 322). He was then referred for a substance abuse evaluation and counseling/treatment for same. (Docket No. 322). He remained on bond through the trial of this matter. (Docket No. 356).

After several continuances and rulings by the Court as to motions in limine and other matters, the case finally proceeded to jury selection and trial in April of 2022. (Docket No. 339). Immediately before jury selection commenced on April 5, 2022, the Court conducted a colloquy with Defendant pursuant to the Supreme Court decisions in *Frye* and *Lafler* at which time he

confirmed that he: understood that no formal plea agreement offers had ever been extended to him by the Government as informal negotiations between the parties had never materialized into a formal agreement; knew that the potential statutory penalties upon a conviction were up to 30 years' imprisonment at each count; and wanted to proceed to trial despite the potential penalties. (Docket No. 351).  The case was then tried over the next few days, at which time the Government presented the testimony of eight witnesses and introduced numerous exhibits.  (Docket Nos. 352-355; 383; 384).

At the conclusion of the Government's case-in-chief, the Court heard argument on a motion for judgment of acquittal made by the defense and denied same.  (Docket No. 384).  The Court initially overruled Defendant's objections to the chain of custody of the narcotics evidence and found that "the government has sufficiently established the chain of custody so that a rational and reasonable jury could find that the heroin and fentanyl evidence admitted in this case were the heroin and fentanyl that were located within the vehicle owned by Mr. Somerville's mother and seized therefrom." *Id.* at 210 (citing *United States v. Rawlings*, 606 F.3d 73 (3d Cir. 2010)).   The Court also provided a detailed recitation of the evidence presented by the Government.

> First, the Court heard the testimony of Sergeant Patton as it was read into the record. I also heard the testimony of Sergeant Joel Hamilton and Officer Shane McGrath concerning this traffic stop in Robinson Township.
>
> Now these officers […] testified that the vehicle, which was registered to defendant's mother, was being driven by Natel Walker with the defendant as his passenger.  That implies to me that either she or he permitted the use of that vehicle.
>
> …
>
> Relative to the car, we have heard a lot about these stamp bags and where they were located. And ultimately, they were found in the console area of both the driver's and passenger's sides of the vehicle. And they [were] found, in part, […], under the rug or under the plastic of the console, so they were kind of hidden away.

4

Officer McGrath, I think, did a terrific job explaining how the K-9 officer was used to conduct the search and how he alerted to the areas both underneath the vehicle and within the vehicle where the stamp bags were located. And in fact, he even said that the K-9 floored aggressively [and] alerted by scratching and biting and that helped to cause the stamp bags or bundles to fall out from between the plastic console and the adjoining carpet.

Officer McGrath also said that he removed the K-9 from the vehicle at that point because of the danger that's presented to the dog itself from heroin. And we know that Sergeant Patton testified that he located several bundles of heroin on the driver's side of the vehicle where Mr. Walker was [located]. And Hamilton, on the other hand, told the jury that he worked with Patton and he looked on the other side, the passenger's side where Mr. Somerville was, and there was another bundle of suspected heroin there.

Both Sergeant Patton and Detective Thomas Walsh […] explained that subsequent search of the vehicle after a search warrant was obtained from Judge Cashman, I believe, resulted in the seizure of an additional two bundles of heroin. These stamp bags and several photographs of the stamp bags were admitted into evidence. They appear at J-10 and J-11A through J-20B. And I think we ultimately saw the actual drugs that were involved. And they weren't taken out of the package, but be that as it may, they're here in the court having arrived in a [FedEx] box.

The Court did hear testimony regarding policies and procedures of the Robinson Township Police Department from both Sergeant Hamilton and former Chief Vietmeier. They each reviewed the property record at J-4 and explained how […] narcotics evidence […] would be packaged, sealed and submitted to the evidence room located within the department's headquarters.

In my estimation, their […] testimony demonstrated that the packages within which the narcotics were stored were marked with the initials of the individual who opened the package when they were sealed and unsealed, including the officers and lab employees who tested the narcotics.

Emily Wilkinson also testified in the same vein about the procedures used at the Allegheny Office of the Medical Examiner and the reports which were generated when she tested the narcotics, including notations that the stamp bags were in sealed packages.

Now when you look at the evidence reports, J-5 and J-7, they detail that the Robinson Township Police Department submitted two separate sealed envelopes for examination, one of which contained nine bundles of heroin and the other contained two bundles of heroin on two separate occasions.

The evidence was submitted to the crime lab on January 13, 2016. And if you recall, Ms. Wilkinson said that generally these deliveries are in person. And […], it was Officer Dugan who made the delivery. And that report was ultimately dated February 29, 2016.

The evidence was resubmitted, if you will, at the request of [the prosecutor] Mr. Lenhardt. And Chief Vietmeier […] testified that because he was trying to wrap things up, they were trying to reduce what was in the evidence vault, and he described in detail their procedures. And in that regard, I also think it's noteworthy when you look at Exhibit 7, it was Chief Vietmeier who made the delivery in July of 2016. And to me, that's consistent with his earlier testimony that he went back through the garbage and he pulled out what it was that Mr. Lenhardt wanted to have retested and then he personally delivered it to the lab.

…

As has been explained in some detail by witness Detective Justin Simoni, […] through various portions of these text messages, we saw and heard not only the names of many of these heroin stamp bags, the brands that are used, but as you read through this and you read the context, it's clear, […] people are contacting each other by text messages to buy and sell drugs. That's what this is all about. This goes on for pages and pages.

Now, I think it's been clearly established that this particular [phone dump of text message evidence], relates to Mr. Somerville. At the very beginning you can see, based on these records, that he's the owner of the phone. And as I said, the jury is going to have all of this to look at, not just those that were highlighted by Mr. Simoni, because this has all been entered into evidence.

Now, to that end, as you go through […] these text messages, for example, the prices of the drugs meshed with the expert testimony of Mr. Simoni what they were -- drugs were selling for at the time. So that might give that information, you know, more credence with the jury. And the various discussions about the quality, good, bad or indifferent, it goes back and forth. You know, there are references to bricks. For example, at 118, 292-A, Bro says: I hit a little luck I

need two bricks I'm in Elliott. Interestingly, on that same page there's also reference to somebody breaking into Dave's house and taking 50 Gs. So as I said, the jury is going to have all of that to consider in this case.

[…] So when I review all of these text messages at a minimum and then I look at some of the text messages of Mr. Walker, too, it appears that Mr. Somerville was in the business of trafficking narcotics. And as I said, the physical evidence, the stamp bags just having the same logos, HBO, Louis Vitton, See No Evil and Witch Out, as depicted on J-21, conform with what's in these text messages.

Much of this evidence also, in my estimation, supports the elements of defendant's knowledge of the drugs and his intent to distribute. I would also add that the jury has heard that the narcotics were packaged in stamp bags, wrapped in bundles. That's a manner that's typically used to package these types of drugs for distribution.

While Emily Wilkinson […] tested the narcotics and determined that the total quantity of heroin and/or fentanyl was approximately 2 grams, law enforcement also searched the vehicle and both Walker and the defendant. And these searches did not result in the recovery of any drug paraphernalia, which could be used to ingest heroin, either intravenously, by shooting it up, or nasally, by snorting.

The most significant evidence of intent, once again, are these text messages on Mr. Somerville's phone at J-2A and Mr. Walker's phone at J-3.

…

As the government pointed out the phone at J-2A contains a selfie photograph of the defendant.

(Docket No. 384 at 212-215; 220-222).   The Court then recessed for the evening with the expectation that the defense was not going to call any witnesses, including Defendant himself.  (*Id*. at 223-224).

On the morning of April 8, 2022, the jury, counsel for the parties and the other trial participants arrived on time to start the proceedings while Defendant was a few minutes late. (Docket No. 385 at 2).   Upon his arrival, defense counsel Martin Deitz, Esq. requested an

7

opportunity to meet with his client and the Court agreed, delaying the proceedings while they privately conferred in the attorney conference room.  (Docket No. 14-15).  The lead prosecutor AUSA Ross Lenhardt briefly joined Defendant and his counsel at which time they discussed Defendant's decision to change his plea to guilty on both counts.  (*Id*. at 15).  When the attorneys emerged from this meeting, they informed the Court's staff of these developments and the Court returned to the Bench to preside over a change of plea hearing.  (*Id*. at 15-16).

As is this Court's practice, a detailed colloquy was conducted with the Defendant at which time the Court found that he had knowingly and voluntarily entered his guilty pleas after consultation with his counsel and was fully informed of his trial rights and the potential statutory penalties for the offenses.  (Docket No. 385).  The Court determined that Defendant was competent as he reported that he was 33 years' old; a high school graduate; had taken his prescribed medications for his mental and emotional health conditions which did not affect his ability to understand the proceedings; and was not under the influence of alcohol or illegal drugs.  (*Id*. at 18-20, 43).  He is also no stranger to proceedings in federal court as he has participated in numerous conferences and hearings both in this matter as well as his prior case before the Hon. Donetta W. Ambrose at Crim. No. 09-341.  (*See e.g.*, Docket Nos. 104; 120; 122; 142; 149; 154; 186; 191; 198; 210; 299; 303; 349-354).

With respect to the ongoing trial proceedings, Defendant stated that he understood that the Government had rested its case against him and that he was waiving any further trial by pleading guilty.  (Docket No. 385 at 27-28).  The attorneys confirmed that there was no plea agreement and while they had discussed the guidelines at length, there were no stipulations as to the guidelines and neither attorney had fully computed the advisory guidelines range, including the drug quantity, all of which would depend upon a further evaluation of the trial evidence.  (*Id.* at 32).

THE COURT: Now, have you and Mr. Dietz talked about guidelines and how they could apply to you?

THE DEFENDANT: Yes, Your Honor.

MR. DIETZ: A lot.

THE DEFENDANT: Yes.

THE COURT: Mr. Dietz is saying "a lot" and you're saying "yes". Right?

THE DEFENDANT: Yes.

THE COURT: Now, do you understand that I won't be able to compute your advisory guideline range until after I get the complete pre-sentence report and both Mr. Dietz and Mr. Lenhardt have each had a chance to object. Then it goes back to the probation officer and he or she makes a response. Then it comes to me and [my law clerk], and we look at what's been said there. And to the extent that you're still debating what the guidelines are, you're debating the facts, the Court issues something called tentative findings. And part of that deals with fact problems, and part of it deals with computing the guidelines. And that will come out in a written form and it will look like [an] opinion. […]. Mr. Dietz will get it, and he'll go over it with you prior to your sentencing. Do you understand that, Mr. Somerville?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Mr. Lenhardt, have you computed the guideline range for this case?

MR. LENHARDT: No.

THE COURT: Oh, okay.

MR. LENHARDT: Just give you the shortest answer I can. I tried to do estimates when we run the case through our chain of command when it comes time to originally charge him. But many things have changed since then. So I have a better handle on his criminal history than I do the offense level in this particular case, Your Honor.

THE COURT: What do you think his criminal history might be?

MR. LENHARDT: He had a previous pre-sentence report here, Your Honor. I have it here somewhere and I can pull it out and let you know what that is.

MR. DIETZ: Your Honor, if it helps, I do know in the prior pre-sentence report his criminal history category was a IV. There may be some debate about whether it's a IV or V today, but it's either a [IV] or V.

…

THE COURT: Okay. And to that end, as we well know, there's an 851 here. So [the Government is] going to be seeking an enhancement on that basis. And Mr. Somerville, you should know that to the extent that you and Mr. Dietz don't think that's appropriate, you need to make that argument before I give you a sentence. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Again, keep your voice up a little bit, sir. Mr. Dietz, have you had a chance to formulate your position on the guideline range or is it still in flux like Mr. Lenhardt?

MR. DIETZ: Your Honor, the only reason it's in flux is based on the trial evidence in this case. Mr. Lenhardt and I have had a very general discussion today prior to the plea about that with Mr. Somerville present. I do not have a final calculation now, Your Honor. One of the big issues in our case -- and I think I reduced this to writing in the motion for bond although it's not updated. I believe Mr. Somerville has about 55 actual months of credit towards a sentence this Court would impose. So with respect to the specific guidelines, we've had discussions prior to trial and I think the government's position will change based on the evidence in this case. So we do not know what the guidelines are. And Mr. Somerville and I have had lengthy discussions about the applicability of the United States sentencing guidelines, in general.

THE COURT: Okay. Thank you, Mr. Dietz. Mr. Somerville, you understand that I'm not bound by any recommendation of a sentence your attorney, the attorney for the government, or anyone else may have suggested to you and I can still sentence you up to the maximum permitted by the statute? Do you understand that, sir?

THE DEFENDANT: Yes, Your Honor.

(Docket No. 385 at 33-36).

Defendant later confirmed that no one had promised him any particular sentence; predicted

what his sentence might be; nor told him to respond untruthfully to the Court's questions.

> THE COURT: Has anybody made any kind of a promise to you that has caused you to want to plead guilty here this morning?
>
> THE DEFENDANT: No, Your Honor.
>
> THE COURT: Has anybody predicted to you what your sentence is going to be?
>
> THE DEFENDANT: No, Your Honor.
>
> THE COURT: And I haven't given you a sentence yet, right?
>
> THE DEFENDANT: No, Your Honor.
>
> THE COURT: Because as I told you, I need to study all these other things that are going to still come my way on your case. Have you been instructed by any attorney, including your own, Mr. Dietz, the attorneys for the government, Mr. Lenhardt or Mr. Risacher, or anyone else to respond untruthfully to a question about a promised sentence? Has anybody told you to lie about a promised sentence?
>
> THE DEFENDANT: No, Your Honor.
>
> THE COURT: So you understand everything I've just discussed with you. Is that right?
>
> THE DEFENDANT: Yes, Your Honor.

(Docket No. 385 at 42).

Defendant also accepted the Government's factual recitation of his offense conduct,

without objection.

> THE COURT: Mr. Lenhardt, do you want to summarize the government's evidence as to these counts one and two.
>
> MR. LENHARDT: I can do it really easily, Your Honor, by just incorporating the government's trial evidence in this case. And in

that, I have already rested at the trial, and I would also rest for purposes of the guilty plea.

THE COURT: Now, Mr. Somerville, do you agree with what the prosecutor, through the government's witnesses, has said as to what you did? Is there anything you and/or Mr. Dietz want to add or correct at this time? And maybe you two need to talk about that before you answer this question. (Off the record)

THE COURT: Let the record reflect conferral.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. So in answer to my question, Mr. Somerville, you are agreeing with the testimony and the exhibits that the government has supplied as to what you did back in 2015 and early 2016. Is that right?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Mr. Dietz, is there anything you want to add at this time?

MR. DIETZ: No, Your Honor. I just want to make clear so Mr. Somerville understands, that that doesn't preclude us from raising any factual issues at sentencing.

THE COURT: No question. You can still make whatever argument you might have at the time of your sentencing, no question.

MR. LENHARDT: To the extent that it matters, I concur.

(Docket No. 385 at 39-40).  The Court found that there was a factual basis to accept Defendant's guilty pleas, he reasserted that he wanted to plead guilty, and then proceeded to do so, which was consistent with the advice of his experienced counsel.  (*Id*. at 40-41). Indeed, he stated twice during the proceeding that he was satisfied with his counsel and the job that he had done for him.  (*Id*. at 21, 43).

At the conclusion of the change of plea hearing, Defendant's bond was continued, and he was reminded that any violation of his conditions may result in revocation and incarceration.

12

(Docket No. 385 at 49-52).   A few weeks later, on April 27, 2022, Defendant was arrested following a traffic stop and charged with numerous state offenses including possession with intent to deliver several different controlled substances.  (Docket No. 366).  A warrant was issued for his arrest, and he has remained detained since that time.  (*Id.*).

The Probation Office disclosed the Final Presentence Investigation Report ("PIR") to the Court and the parties on May 31, 2022, wherein the Probation Office determined the following:

- The type and quantities of controlled substances attributable to Defendant's criminal conduct for purposes of Guideline § 2D1.1 was 3.322 grams of fentanyl and 0.872 grams of heroin which resulted in a converted drug weight of 9.177 kilograms and an offense level of 12;

- Defendant was not entitled to a reduction for acceptance of responsibility under Guideline § 3E1.1(a) because he had been arrested and charged with new criminal conduct involving his possession with intent to distribute various controlled substances;

- No other enhancements or adjustments to the offense level were applicable; and,

- Based on a total offense level of 12 and a criminal history category of V, the advisory guidelines range in this case is 27-33 months' incarceration.

(Docket No. 370).    Defendant filed his Position With Respect to Sentencing Factors on June 8, 2022, at which time he lodged an objection to the lack of a 2-level reduction for acceptance of responsibility under Guideline § 3E1.1(a) and advocated that the advisory guidelines range should be 21-27 months' incarceration with the reduction.  (Docket No. 372).  The Government was granted an extension of time and filed its Position With Respect to Sentencing Factors on June 16, 2022.   (Docket No. 376).   In this submission, the Government sets forth an extensive summary/proffer of evidence from the text messages admitted at trial while advocating all of the following:

- the type and quantity of controlled substances attributable to Defendant for purposes of Guideline § 2D1.1 should be substantially increased to 1,251.95 grams of opiates and results in a base offense level of 30;

- the offense level should be increased by 2-levels pursuant to Guideline § 2D1.1(b)(1) because he allegedly possessed a dangerous weapon;

- the offense level should be increased by another 2-levels under Guideline § 2D1.1(b)(12) because he allegedly maintained a premises for the purpose of manufacturing or distributing a controlled substance;

- the offense level should be increased by an additional 2-levels under Guideline § 2D1.1(b)(16) because he allegedly distributed drugs to an individual under the age of 18;

- the offense level should not be decreased 2-levels for acceptance of responsibility under Guideline § 3E1.1(a) due to his subsequent arrest; and,

- the total offense level should be 36 and based on a criminal history category of V, result in an advisory guidelines range of 292-365 months' incarceration.

The Probation Office submitted an Addendum on June 21, 2022, recommending that one of the 2-level enhancements for distributing drugs to a minor would not apply but deferring to the Court to resolve the rest of the parties' disputes. (Docket No. 378). Defendant replied on August 5, 2022 contesting all of the enhancements sought by the Government and continuing to advocate for an advisory guidelines range of 21-27 months' incarceration. (Docket No. 386). The Government filed another brief on August 22, 2022 in further support of its position. (Docket No. 394).

Shortly thereafter, the Court granted Mr. Deitz's motion to withdraw as counsel and appointed Patrick K. Nightingale, Esq. to represent Defendant. (Docket Nos. 398; 399). The instant Motion followed, which is now fully briefed and ripe for disposition. (Docket Nos. 406; 410; 414; 426).

III.     LEGAL STANDARD

Pursuant to Rule 11(d)(2)(b) of the Federal Rules of Criminal Procedure, "a defendant may withdraw a plea of guilty or nolo contendere ... after the court accepts the plea, but before it imposes sentence if ... the defendant can show a fair and just reason for requesting the withdrawal." FED. R. CRIM. P. 11(d)(2)(b); *see also United States v. Wilson*, 429 F.3d 455, 458 (3d Cir. 2005) ("if a motion for withdrawal of a plea of guilty or nolo contendere is made before a sentence is imposed ... the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason."). However, "withdrawal of a guilty plea is not an absolute right," *Wilson*, 429 F.3d at 458, and, "once accepted, a guilty plea may not automatically be withdrawn at the defendant's whim." *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001) (citing *United States v. Martinez*, 785 F.2d 111 (3d Cir. 1986)). The Court of Appeals has directed that this Court consider the following three factors in order to evaluate whether a defendant has presented a fair and just reason for withdrawing a plea of guilty: (1) whether the defendant asserts his innocence; (2) whether the defendant proffered strong reasons justifying the withdrawal; and (3) whether the government would be prejudiced by the withdrawal. *United States v. King*, 604 F.3d 125, 139 (3d Cir. 2010) (citing *Martinez*, 785 F.2d at 114). "The burden of demonstrating those factors 'is substantial' and 'falls on the defendant[.]' Whether to grant a motion to withdraw a guilty plea lies within the discretion of the district court." *United States v. James*, 928 F.3d 247, 253 (3d Cir. 2019) (quoting *Jones*, 336 F.3d at 252).

IV.     DISCUSSION

As noted, Defendant seeks leave of Court to withdraw his guilty pleas to Counts 1 and 2 of the Indictment because of the parties' disputes surrounding the advisory guidelines range in his case. (Docket Nos. 406; 414). He claims that his guilty pleas were unknowingly or involuntarily entered because of his mistaken impression that he would be sentenced to "time served" and the

Government would not seek all of the sentencing enhancements that remain pending before the Court.  (*Id*.).  He further asserts that his former counsel was ineffective because he now faces the prospect of a higher advisory guidelines range than he expected.  (*Id*.).  The Government counters that Defendant has failed to meet his substantial burden to demonstrate that his guilty pleas should be withdrawn.  (Docket Nos. 410; 416).  Having carefully considered the parties' positions in light of the factors set forth by the Court of Appeals, the Court concurs with the Government that Defendant has not shown a fair and just reason to withdraw his guilty pleas and will deny his motion.

Turning to the initial factor, Defendant has not made a "credible showing of innocence, supported by a factual record," sufficient to warrant withdrawing his guilty pleas.  *United States v. Ho-Man Lee*, 664 F. App'x 126, 128 (3d Cir. 2016).  Indeed, he has neither asserted his innocence nor proffered any legal defense to the charges against him.  *See James*, 928 F.3d at 253. At the change of plea hearing, Defendant admitted that he engaged in the conduct alleged by the Government and that the evidence presented at trial was sufficient for a jury to convict him. (Docket No. 385 at 39-40).  The Court reached the same conclusion one day earlier, when it denied his motion for judgment on acquittal and summarized the trial evidence.  (Docket No. 384 at 212-222).  As Defendant's guilty pleas are well supported by the facts and the law, this factor does not weigh in favor of his motion to withdraw.  *See Jones*, 336 F.3d at 252 ("Bald assertions of innocence are insufficient.").

Moving on to the next factor, the Court finds that Defendant's proffered reasons for his desire to withdraw his guilty pleas do not justify setting them aside because they are both factually unsupported and legally insufficient.

At the outset, the Supreme Court has held that a defendant's statements, made under oath in open court, "carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Further, "[c]ourts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded […]. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017). The U.S. Court of Appeals for the Third Circuit has also held that courts should not set aside a validly entered guilty plea based on unsupported claims by a defendant which are contradicted by his prior sworn statements at the plea hearing. *See United States v. James*, 928 F.3d 247 (3d Cir. 2019).

In addition, "[t]he longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (internal quotation and citation omitted). To ensure a valid plea, a defendant must be informed of the "'direct consequences' of a guilty plea," including the permissible range of sentences and any statutory minimum and maximum penalties which may be imposed by the Court. *Jamison v. Kelm*, 544 F.3d 266, 277 (3d Cir. 2008) (quoting *Brady v. United States*, 397 U.S. 742, 755 (1970)). The Court must also inform the Defendant of the rights he is waiving which are listed in Rule 11(b)(1) and find that the plea was voluntary as opposed to coerced or due to threats or misrepresentations. *See* Fed. R. Crim. P. 11(b)(1)(A)-(O), (2). The United States Court of Appeals for the Third Circuit has repeatedly held that a thorough colloquy, where the Court provides the defendant with the maximum potential penalties and advises him that the sentencing guidelines are advisory, cures any potential prejudice arising out of counsel's mistaken advice regarding a possible sentence or computation of the

advisory guidelines range. *See, e.g., United States v. Bui*, 795 F.3d 363, 367 (3d Cir. 2015) (citing *United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007) ("an erroneous sentencing prediction by counsel is not ineffective assistance of counsel where ... an adequate plea hearing was conducted")).

 Here, Defendant's claims that the prosecutor told him that the Government would not seek enhancements based on the trial evidence and would not oppose a 2-level reduction for acceptance of responsibility and that he reasonably expected a sentence of "time served" are not supported by any evidence and directly contradicted by his own statements during the change of plea hearing. *See James*, 928 F.3d at 257-58.  To that end, Defendant expressly stated that no one had promised him a specific sentence; predicted what his sentence would be; nor told him to respond untruthfully to a question about a promised sentence.  (Docket No. 385 at 42).  He also acknowledged that: neither of the attorneys had computed the advisory guidelines range at the time that he entered his guilty pleas; he could be sentenced to a period of incarceration up to the statutory maximum of 30 years at each count; and that the Court would not be computing the advisory guidelines range in his case until after the PIR was produced and the parties had the opportunity to lodge objections. (*Id*. at 33-36).  Defendant was attentive throughout the proceeding including when his former counsel, Mr. Deitz, stated that he and Defendant had a very general discussion about the guidelines with the prosecutor prior to the hearing, that the advisory guidelines range was "in flux," and that the Government's position regarding the range may change based on the trial evidence.  (*Id*.).  He further confirmed that he had not been threatened or coerced into pleading guilty and that his pleas represented his voluntary choice.   (*Id*. at 42).  Since Defendant's sworn responses during the detailed plea colloquy contradict all of his claims, the Court declines to credit his current proffer

that he was misled about his potential sentencing exposure under the guidelines.  *See James*, 928 F.3d at 257-58.

Beyond the lack of evidentiary support, it is well established that "[a] shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons" for a defendant to withdraw a validly entered guilty plea.  *See Jones*, 979 F.2d at 318.  Further, a defendant's "[d]issatisfaction with an offense level calculation is not a strong reason for withdrawing a guilty plea." *United States v. Graulich*, 524 F. App'x 802, 806 (3d Cir. 2013) (citing *United States v. King*, 604 F.3d 125, 140 & n. 7 (3d Cir. 2010)).  In this regard, Courts in the Third Circuit have consistently refused to permit the withdrawal of guilty pleas by a defendant who is experiencing "pleader's remorse" after learning that the advisory guidelines range in his case is higher than he expected but was thoroughly advised of his potential sentencing exposure at the plea hearing.  *See e.g.*, *King*, 604 F.3d at 140 ("[t]he absence of any explanation is strong support for the District Court's finding that King suffered from 'pleader's remorse' once he learned of the proposed Guidelines range in the Presentence Report."); *United States v. Cormier*, 758 F. App'x 269, at 275-76 (3d Cir. 2018) ( "any prejudice resulting from the erroneous sentencing information provided by prior counsel was remedied by the detailed in-court plea colloquy" where the defendant "was told he could be subject to ACCA's enhanced penalties."); *Graulich*, 524 F. App'x at 806 (affirming denial of motion to withdraw plea when real reason for motion "was the Probation Office's calculation of a higher offense level than that contemplated by the plea agreement."); *United States v. Robinson*, 186 F. App'x 240, 242 (3d Cir. 2006) (denying motion to withdraw plea submitted after Probation Office determined that defendant was a career offender).

The same is true in these circumstances because the record plainly demonstrates that Defendant entered valid guilty pleas with a full understanding that: the advisory guidelines range

had not been computed by the parties; the parties would have the opportunity to present evidence and argue as to the appropriate computation of the advisory guidelines range prior to the Court determining the advisory guidelines; and he could be sentenced up to the statutory maximum penalty of 30 years. (Docket No. 385 at 32-36, 42). In fact, the Court has not yet resolved the parties' objections nor computed the advisory guidelines range due to the need to address the pending motion and it remains to be seen whether the Court will ultimately conclude that the advisory guidelines range should be 21-27 months, as Defendant advocates, 27-33 months, as computed by the Probation Office, 292-365 months, as the Government advocates, or some other range. (*See* Docket Nos. 370; 372; 376; 378; 386; 396). After the range is computed, the parties will be provided the opportunity to submit sentencing memoranda including any motions for departures and/or variances, and then present evidence and argument at the sentencing hearing. (Docket No. 385 at 33-34). Of course, Defendant and his counsel remain able to argue that an appropriate sentence in this case is "time served" but it will be up to the Court to make the ultimate decision and impose his sentence. (*Id*. at 27-28, 31-32, 42).

All told, the Court's detailed plea colloquy with the Defendant was more than sufficient to demonstrate that he was competent, fully understood the rights that he was waiving, and knowingly and voluntarily pled guilty to Counts 1 and 2 of the Indictment. (*See* Docket No. 385). Accordingly, Defendant has not presented a sufficient reason to warrant the withdrawal of his guilty pleas.

With respect to the final factor, "the Government need not show […] prejudice when a defendant has failed to demonstrate that the other factors support a withdrawal of the plea." *James,* *928 F.3d at 259* (quoting *Jones,* *336 F.3d at 255*). However, the Third Circuit has held that prejudice to the Government is presumed if the guilty pleas were entered at a time when the trial

proceedings have already commenced. *See e.g., United States v. McLaughlin*, 647 F. App'x 136, 142 n.4 (3d Cir. 2016) (observing that "the [G]overnment would be prejudiced" where the defendant entered a guilty plea on the first day of trial and withdrawal of the plea would force the Government to "reassemble witnesses, court personnel and jurors, all of which had already been assembled once on the day McLaughlin pleaded guilty"); *United States v. Davis*, 106 F. App'x 788, 790 (3d Cir. 2004) (government would be prejudiced by withdrawal of plea entered on the first day of trial); *United States v. Crowley*, 529 F.2d 1066, 1072 (3d Cir. 1976) (prejudice to the Government is presumed if the plea is entered "when jurors, witnesses and court personnel had been assembled for the trial...."). Certainly, the Government would be prejudiced if the guilty pleas were withdrawn because it has already presented its case against Defendant to a jury (including eight witnesses and numerous exhibits over several days) and the trial was discontinued at Defendant's request so that he could plead guilty. (Docket Nos. 349-356; 383-385). The Government would also be prejudiced if any additional witnesses are unavailable due to the significant passage of time as one of its witnesses, Sergeant Patton, passed away prior to trial and another witness, Chief Vietmeier, retired and moved out of the area. Since Defendant has not asserted his innocence and failed to present a substantial reason to justify withdrawing his guilty pleas, the Court sees no basis to require the Government to undertake the expense, difficulty, and risk of re-trying this case. *See Brown*, 250 F.3d at 815 (quoting *Jones*, 979 F.2d at 318 ("A shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty.")).

For all of these reasons, the Court finds that Defendant has failed to meet his burden to show a "fair and just reason" to withdraw his guilty pleas and declines to exercise its discretion to permit him to do so.  *See James*, 928 F.3d at 253.

V.       CONCLUSION

Based on the foregoing, Defendant's Motion [406] is DENIED.  An appropriate Order follows.

<u>*s/Nora Barry Fischer*</u>
Nora Barry Fischer
Senior U.S. District Judge

Dated: February 14, 2023

cc/ecf:  All counsel of record.